UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DIMAS PEREZ,                                           :
                                                       :        **MEMORANDUM & ORDER**
                                    Petitioner,        :
                                                       :        06-CV-0492 (ENV)
          -against-                                    :
                                                       :
JOSEPH SMITH, Superintendent, Shawangunk              :
Correctional Facility,                                 :
                                                       :
                                    Respondent.        :
------------------------------------------------------------------x

**VITALIANO, D.J.**

    Pro se petitioner Dimas Perez is before the Court on his petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the writ is denied and

Perez's habeas petition is dismissed.

## I.    BACKGROUND

    On December 12, 1997, Robinson Robule and Mariano Gaton were fatally shot at a small

grocery store located in East New York, Brooklyn. Miranda Baez observed the crime from

across the street. Wayne Bouricicault and Diane Bennett were a block from the grocery store.

The duo turned around when they heard the gunshots to see the shooter leaving the store with a

handgun. All three eyewitnesses selected petitioner from lineups and he subsequently

surrendered to the police on December 30, 1997. Perez was charged, under Kings County

Indictment Number 44/1998, with two counts of murder in the first degree, four counts of

murder in the second degree, one count of criminal possession of a weapon in second degree, and

one count of criminal possession of a weapon in the third degree.

## A. Jury Selection

Jury selection began on May 17, 1999. (Tr. 378.) After the second round of selection, the prosecution exercised three peremptory challenges directed at the first group of seven prospective jurors—Lawrence, Soto, and Generette—to which the defense initially did not raise any objection. (Tr. 707.) From the second group of five prospective jurors, the defense challenged one juror for cause and the prosecution peremptorily challenged two jurors—Melendez and Cantine. (Tr. 711.)

After the prosecution's second round of peremptory challenges, the defense raised a Batson objection on the ground that "[e]very single person [the prosecution] knocked out [by peremptory challenges was] a person of color, African American or Hispanic descent." (Tr. 711.) Specifically, the defense noted that Lawrence was a black male, Generette was a black female, Soto was Hispanic, Melendez was a Hispanic female, and Cantine was African-American.[1] (Tr. 711-12.)

---

[1] During voir dire, the prospective jurors provided the following information:

(1) Lawrence was a married father of two who stated that he would be more concerned about his child than the case. He explained that any sequestration would diminish his ability to care for his three-month-old baby; no one else could pick up the child, and, if selected, his wife would have to take a cab. (Tr. 633-34, 673-74.)

(2) Generette had been the victim of a burglary within the past year. One family member was shot six times in Georgia, and another family member or friend was shot and killed in Brooklyn during a drug-related case that had not yet gone to trial. She had family members who practiced criminal law, and others who had been convicted and incarcerated for drug-related crimes. Generette stated that the murder of her friend in the drug dispute would not impact her ability to make an independent judgment in the case. (Tr. 597-600, 684-85.)

(3) Soto was an unemployed seasonal worker, married with four children. He was a mugging victim, had a friend who was a police officer, and his cousin was arrested within a week of the voir dire for possession of marijuana. Soto said jury service would interfere with his children's Little League activities. He also suggested he might know the defendant when he said, "I might have . . . bumped into him. I am not saying that I know him personally." He

Referring to potential jurors Melendez and Cantine, the trial court asked the prosecutor whether his peremptory challenges were racially motivated. (Tr. 711.) The prosecutor responded by inquiring whether the court had found that the defense had made out a prima facie case, as required by Batson. (Tr. 711-12.) Defense counsel, Lisa Scolari, reiterated her position that every person challenged by the prosecutor in the second round of jury selection was black or Hispanic. (Tr. 711-12.) While the Court still did not make an explicit finding of prima facie discrimination, it once again asked the prosecution for its reasons. (Tr. 712.) The prosecutor stated that Cantine was both a resident of and active realtor in East New York, where the crime took place, suggesting that he might have particular knowledge of the crime scene area. (Tr. 712.) With respect to Melendez, the prosecutor noted that she was a 26-year-old unmarried college student who did not have the "life experience to deal with a case of this nature." (Tr. 713.)

The trial court then allowed defense counsel to be heard on why the prosecution's proffered reasons were pretextual. The defense noted that the prosecutor never questioned Cantine about his knowledge of the crime scene and the potential for him to bring his experiences from East New York into his service on the jury, but rather "looked at him and challenged him." (Tr. 713.) Scolari added that East New York was too large of a neighborhood

---

said this would not impair his ability to convict the defendant if the evidence proved him guilty beyond a reasonable doubt. (Tr. 655-62.)

(4) Melendez was a 26-year-old college freshman, single, and employed as a receptionist. She was the victim of a gunpoint mugging in Brooklyn where no arrest was made, and her father was the victim of a robbery-assault that caused physical injuries. (Tr. 611-12.)

(5) Cantine was a licensed electrician, realtor, and loan officer. His ex-wife worked for the New York Times, and his cousin was a lawyer in Brooklyn. He initially claimed he could not be sequestered because of outside job sites as a contractor, but reluctantly admitted he could be sequestered for no more than one or two days. (Tr. 650-54.)

to conclude that Cantine was actually familiar with the crime scene area. (Tr. 713-14.) She also argued that the prosecution's reasons for striking Melendez were pretextual because the information provided regarding her age, marital status, and education was insufficient to determine that she lacked the maturity or sophistication to serve on the jury. (Tr. 714.)

After allowing the prosecution to be heard again, the trial court granted the Batson challenge with regard to Cantine, but denied the same as to Melendez. (Tr. 714-15.) Defense counsel then requested that the court review her objections about Lawrence, Generette, and Soto. (Tr. 716-18.) Before proceeding to that inquiry, the trial judge stated his belief that "the record reflected the reasons why [the prospective jurors] were challenged." (Tr. 718.)

Defense counsel disagreed and noted that it was the prosecutor's burden to explain why his challenges were race-neutral. (Tr. 719.) The court responded that it was only "trying to enlighten [defense counsel] as to the Court's thinking on [the matter]." (Tr. 719.) The trial judge then proceeded to explain that he was "pretty sure [the prosecutor was] going to argue that . . . similarity was the basis for him to challenge [Melendez]" who was of similar age to the defendant. (Tr. 720.) As for Soto, who stated he may have known the defendant, the court found that "it would be foolish for [the prosecutor] to go ahead and select [Soto] because of the possible familiarity and association." (Tr. 720.) The defense again objected that the court, instead of the prosecutor, was impermissibly providing race-neutral reasons for the peremptory strikes. The court retorted that it had not yet determined whether the defense had made out a prima facie case for discriminatory peremptory challenges, but was "trying to get to the bottom without a prolonged discussion." (Tr. 721.)

After continued defense objections, the court ordered the prosecutor to "[g]o through each and every one" and state the reasons for the remaining challenges. (Tr. 723.) Defense

4

counsel again objected, arguing that the court had "given [the prosecutor] Mr. Reeves the green light as to what he should say, if he did not figure that out." (Tr. 723-24.) Although the court had noted that the reasons for the peremptory challenges were "obvious from the record," the prosecution stated additional reasons for them.[2] (Tr. 724.) Defense counsel objected to the reasons as pretextual, stating the prosecutor was "having wild fantasies in the courtroom." (Tr. 726.) The court agreed with the People and ruled that there was no discriminatory intent in their peremptory challenges.

**B. Verdict**

On June 10, 1999, Perez was convicted of murder in the first degree in both shootings. The prosecution's case included the testimony of three eyewitnesses, each of whom identified Perez as the gunman. The defense's case centered on a missing witness, Abraham Lorenzo (a.k.a. Yankee Ematro or Yankee Emeterio), who it argued would testify that he too witnessed the incident and would deny that Perez was the shooter. But, Lorenzo was arrested on unrelated narcotics charges during the pendency of the trial and decided not to testify, invoking the Fifth Amendment. Perez was later sentenced to life-imprisonment without the possibility of parole.

**C. Post-Verdict Proceedings**

On March 19, 2003, Perez moved pursuant to CPL § 440.10 to set aside the verdict on the basis of "newly discovered evidence" that would show that Lorenzo's decision not to testify was the result of prosecutorial misconduct. Perez claimed on his motion that he had learned after

---

[2] With regard to potential juror Generette, the prosecution stated that, in addition to having a family member convicted and incarcerated for selling drugs, it was concerned by the individual's description of her friend's death as being "popped." (Tr. 721-22.) The prosecutor explained that Lawrence was struck due to the child care difficulties he would have if sequestered. (Tr. 726.) Regarding Soto, the prosecution stated its peremptory challenge was due to Soto's flashing the defendant the peace sign and telling him "to hang in there" when leaving the courtroom. (Tr. 726.)

trial that the prosecutor had spoken to Lorenzo's lawyer shortly before Lorenzo was to take the stand and secured Lorenzo's silence by threats of stiffer penalties on the narcotics charges. A three-day hearing was conducted to address this issue, following which the court denied the motion to vacate. The hearing court found, among other things, no misconduct on the part of the prosecutor. On December 18, 2003, the Appellate Division denied Perez's application for leave to appeal this decision, nor would the court consolidate it with Perez's direct appeal from the judgment of conviction that was still pending.

On his direct appeal to the Second Department, Perez argued (1) that the prosecution failed to prove guilt beyond a reasonable doubt and that the guilty verdict was against the weight of evidence; (2) that the court failed to conduct the entire three-step <u>Batson</u> inquiry during jury selection; (3) that the court failed to order disclosure of DD-5 reports relating to interviews of Perez's mother and girlfriend in violation of <u>Rosario</u>; (4) that the sentencing procedures provided for by CPL § 400.27 were unconstitutional; (5) that the prosecution failed to meet its burden of proof at a suppression hearing and that the trial court abused its discretion in denying a defense motion to require identifying witnesses to be produced at the hearing for a limited purpose; and (6) that the prosecution failed to disclose a DD-5 report relating to exculpatory statements by Lorenzo in violation of <u>Brady</u> and <u>Rosario</u>.

On January 24, 2005, the Appellate Division affirmed the trial court's judgment. <u>People v. Perez</u>, 14 A.D.3d 625, 788 N.Y.S.2d 428 (2d Dep't 2005). In addressing the <u>Batson</u> claim, the Appellate Division found that the trial court had conducted a meaningful inquiry into the question of discrimination; the prosecution stated "facially race-neutral" reasons for the peremptory challenges, and defense counsel had the opportunity to argue that those reasons were pretextual. <u>Id.</u> at 625-26. The Second Department also found that nondisclosure of two DD-5

reports memorializing statements of Perez's mother and girlfriend did not violate <u>Rosario,</u> because the authors of the reports did not testify on the matter. <u>Id.</u> at 626. Finally, the court was satisfied that the evidence was legally sufficient to establish the defendant's guilt beyond a reasonable doubt and that the verdict was not against the weight of the evidence. <u>Id.</u> The remaining claims were deemed "unpreserved for appellate review or without merit." <u>Id.</u> On July 19, 2005, the New York Court of Appeals denied Perez's application for leave to appeal. <u>See</u> <u>People v. Perez</u>, 5 N.Y.3d 793, 835 N.E.2d 673 (2005).

Perez timely filed the instant habeas petition on September 22, 2006, presenting the same seven claims raised before the Appellate Division.

## II.   **STANDARD OF REVIEW**

The Supreme Court has made it clear that "[a]s amended by [the Antiterrorism and Death Penalty Act of 1996 ("AEDPA")], § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." <u>Harrington v. Richter</u>, 562 U.S. ___, 131 S. Ct. 770, 786 (2011). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal. <u>Id.</u> (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 332 n. 5, 99 S. Ct. 2781, 2795 n.5 (1979)). Pursuant to AEDPA, a federal court is not free to issue a writ of habeas corpus under the independent "contrary to" clause of 28 U.S.C. § 2254(d)(1) unless "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000) (O'Connor, J., for the Court, Part II). Similarly, a federal court is not free to issue a writ of habeas corpus under the independent "unreasonable application" clause

unless "the state court identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." Id. at 413. But a state court's "unreasonable application" of law must have been more than "incorrect or erroneous:" it must have been "'objectively unreasonable.'" Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001) (quoting Williams, 529 U.S. at 409 (O'Connor, J., for the Court, Part II)).

Lastly, claims that were not adjudicated on the merits in state court are not subject to the deferential standard that applies under AEDPA. See, e.g., Cone v. Bell, 129 S. Ct. 1769, 1784 (2009) (citing 28 U.S.C. § 2254(d)). But where AEDPA's deferential standard of review does apply, "[d]etermination of factual issues made by a state court 'shall be presumed to be correct,' and the applicant 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" Smith v. Herbert, 275 F. Supp. 2d 361, 365-66 (E.D.N.Y. 2003) (quoting 28 U.S.C. § 2254(e)(1)). "This presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility." Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003). This is because "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." Cullen v. Pinholster, 131 S. Ct. 1388, 1401 (2011). Under AEDPA's deferential standard of review, "'[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" Id. (quoting Williams, 529 U.S. at 437).

## III.    **DISCUSSION**

### A. **Weight of the Evidence**

Petitioner first seeks habeas relief on the ground that the prosecution failed to prove guilt beyond a reasonable doubt. Perez contends that the guilty verdict was against the weight of the evidence. As a threshold matter, this claim is unexhausted. In his leave application to the Court of Appeals, Perez did not include his insufficient evidence claim. It is well-settled that before a federal court may consider the merits of a habeas claim, the petitioner is first required to exhaust available state court remedies or demonstrate that "there is an absence of available State corrective process [or that] circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. §§ 2254(b)(1)(B)(i)-(ii); see also Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 808 (2d Cir. 2000). To achieve exhaustion in state court, each federal claim must be "fairly presented" to the highest available state court. Daye v. Attorney Gen. of N.Y., 696 F.2d 186, 191 (2d Cir. 1982); see also Fama, 235 F.3d at 808-09 (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971)). Because Perez did not exhaust available state court remedies for this claim, his habeas petition is mixed; it includes both exhausted and unexhausted claims. See Pratt v. Greiner, 306 F.3d 1190, 1197 (2d Cir. 2002). In this posture, a district court has the authority to deny the habeas petition "on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(2); see Gandarilla v. Artuz, 322 F.3d 182, 186 (2d Cir. 2003), or "offer the petitioner the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims." Pratt, 306 F.3d at 1197 (citations omitted). In the interest of judicial efficiency, and since any attempt by Perez to return to state court on this claim

would be procedurally barred,[3] the Court will consider this claim "on the merits, notwithstanding the failure of [petitioner] to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); Gandarilla, 322 F.3d at 186.

To begin, unlike a sufficiency of the evidence claim—which at least is dually grounded in federal due process principles—a weight of the evidence claim is a creature of state law. See CPL § 470.15(5); Williams v. Breslin, 06-CV-2479, 2008 U.S. Dist. LEXIS 78059, at *17 (E.D.N.Y. Sept. 9, 2008) (citing Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001)) ("A weight of the evidence argument is a pure state law claim grounded in [New York Criminal Procedure Law] § 470.15(5)," whereas a legal sufficiency claim is based on federal due process principles.) As stated, Perez's claim fails to raise a federal constitutional issue and the claim is not cognizable on federal habeas review. See, e.g., Garbez v. Greiner, No. 01-CV-9865, 2002 U.S. Dist. LEXIS 13806, at *25 (S.D.N.Y. July 30, 2002) (quoting Estelle v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 480 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 3102 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (dismissing claim that conviction was against the weight of the evidence because such a claim was not a basis for habeas relief but, rather, presented only an error of state law, for which habeas review is not available).

Nonetheless, mindful of petitioner's pro se status, the Court will construe petitioner's weight of the evidence claim as also raising a sufficiency of the evidence claim. It matters not;

---

[3] In New York, a party seeking leave to appeal to the Court of Appeals must do so within 30 days of having been served with the lower court's ruling. CPL § 460.10(5). It follows that successive leave applications from the same judgment by the same party outside that 30-day window will not be entertained.

Perez has failed to show that the challenged state court determinations were contrary to, or an unreasonable application of, the applicable Supreme Court precedent. Jackson, 443 U.S. 307, 99 S. Ct. 2781.

In assessing a claim regarding the sufficiency of trial evidence, a habeas court must view all "evidence in the light most favorable to the prosecution." Flowers v. Fisher, 296 F. App'x 208, 210 (2d Cir. 2008) (citing Jackson, 443 U.S. at 319, 326). The applicant is entitled to habeas relief only if "'no rational trier of fact could have found proof of guilt beyond a reasonable doubt'" based on the evidence adduced at trial. Id. (quoting Jackson, 443 U.S. at 324). Given that a reviewing court may not substitute its judgment for that of a rational jury, a petitioner "bears a very heavy burden" in challenging the sufficiency of evidence upon which he was convicted. Einaugler v. Supreme Court, 109 F.3d 836, 840 (2d Cir. 1997) (internal quotation marks and citation omitted). Additionally, "[w]hen considering the sufficiency of the evidence of a state conviction, a federal court must look to state law to determine the elements of the crime." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (internal quotations and citations omitted).

Perez has not come close to meeting this burden, regardless of whether the review is conducted on a deferential or de novo basis. There being no evidence of his actual innocence, and in light of, among other evidence, the identification testimony of three witnesses, the sufficiency of evidence claim is meritless. Trying to make the most of it, Perez challenges the veracity of two of the identifying witnesses, who were in a relationship at the time. Not that deleting their testimony from the mix would matter on this claim now, the Court does find their identifications to be reliable, see infra Part III.E. Plainly, the two were subject to extensive cross examination by defense counsel. Plus, their testimony was corroborated by a third independent

witness. As such, a rational jury could easily have found proof of guilt beyond a reasonable doubt. Certainly the state court's presumed determination, given its other findings, that the evidence satisfied the Jackson sufficiency test, was not contrary to, or an unreasonable application of, Supreme Court precedent. See Perez, 14 A.D.3d at 626. The claim, in short, is without merit, and it is rejected.

## B. **Batson Challenge**

Petitioner argues that the trial court failed to conduct a proper Batson inquiry during jury selection. On direct appeal, the Appellate Division found that the trial court "did not improperly rush or compress the Batson inquiry." Perez, 14 A.D.3d at 625. It noted that "[w]hen the defendant first raised a Batson objection, the trial court should have decided whether the defense met its step-one burden of establishing a prima facie case of discrimination," but "[t]hat issue became moot when the People stated their reasons and the court ruled on the ultimate issue." Id. Additionally, the Appellate Division found that "the [trial] court did not meld steps two and three. Defense counsel was allowed to argue that the reasons were pretextual, and thus a meaningful inquiry into the question of discrimination was conducted." Id. at 625-26.

In his petition, Perez objects to two groups of jurors whom the prosecution struck with its peremptory challenges. First, as to venire members Melendez, a Hispanic female, and Cantine, an African-American male, Perez argues that the trial court did not specifically make a finding as to whether the prosecution's proffered race-neutral reasons for challenge were actually pretextual. Second, as to prospective jurors Lawrence, an African-American male, Soto, a Hispanic male, and Generette, an African-American female, petitioner argues that the trial court failed to adhere to the three-step Batson analysis; he contends that the court did not evaluate the

12

prosecutor's proffered reasons for the strikes and did not properly adjudicate the claim in step three by failing "to make either a race-neutral finding or a finding of pretext." (Pet. at 72.)

In Batson v. Kentucky, the Supreme Court held that "[p]urposeful racial discrimination in selection of the venire violates a defendant's [constitutional] right to equal protection because it denies him the protection that a trial by jury is intended to secure." 476 U.S. 79, 86, 106 S. Ct. 1712, 1717 (1986). As correctly subsumed in petitioner's argument, Batson established a three-part test to be applied when determining whether a party made a peremptory challenge in a discriminatory manner.

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

Hernandez v. New York, 500 U.S. 352, 358-59, 111 S. Ct. 1859, 1866 (1991) (internal citations omitted) (citing Batson, 476 U.S. at 96-98).

1. Prima Facie Case of Discrimination

In order to make out a prima facie Batson claim of discriminatory peremptory challenges, a petitioner must show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose," including, for example, a "pattern of strikes" against jurors of a particular race or a "prosecutor's questions and statements during [the] voir dire." Batson, 476 U.S. at 94, 97 (internal quotation marks omitted). Such factors are not exclusive, and it is left to "trial judges, experienced in supervising voir dire [to] be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against jurors [of a particular race]." Id. at 97. Somewhat oddly, Perez argues

13

that the <u>Batson</u> analysis fails in step one because, "the [trial] court failed to determine that the defense had made a <u>prima facie</u> case of discrimination." (Pet. at 68.) But the lack of an explicit determination regarding the <u>prima facie</u> showing is not fatal. This preliminary step may be deemed moot "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination." <u>Hernandez</u>, 500 U.S. at 359. While a court may skip the <u>prima facie</u> step, it is clear that it must still allow for a full record to be established and make a meaningful determination on the question of whether the challenges exhibited discriminatory intent. <u>Jordan v. LeFevre</u>, 206 F.3d 196, 200 (2d Cir. 2000). Equally clear is the sequence of events here. Defense counsel raised the <u>Batson</u> challenge, and, upon the request of the trial judge, made a record memorializing that all five of the People's peremptory challenges had been directed at potential jurors who were African-American or Hispanic. Next, and immediately, the trial judge asked the prosecution for race-neutral reasons justifying the strikes. Upon the offering of race-neutral reasons by the prosecution, "the preliminary issue of whether the defendant had made a prima facie showing [became] moot." <u>Hernandez</u>, 500 U.S. at 359. Any failure to follow the liturgy rather than the substance of <u>Batson</u> offers no haven for relief.

    2. <u>Race-Neutral Reasons</u>

All that is critical at this point, regardless of the route there, is that the burden had shifted to the prosecution as the nonmoving party, to provide a facially neutral explanation for the peremptory strikes it executed. <u>Batson</u>, 476 U.S. at 97. "The nonmoving party's burden at step two is very low," <u>McKinney v. Artuz</u>, 326 F.3d 87, 98 (2d Cir. 2003), and the nonmoving party's explanation "need not rise to the level justifying exercise of a challenge for cause." <u>Batson</u>, 476 U.S. at 97. Rather, to be facially neutral, the explanation must be "based on something other

14

than the race of the juror." Hernandez, 500 U.S. at 360. An explanation need not be "persuasive, or even plausible," and that explanation will be found race-neutral "[u]nless a discriminatory intent is inherent." Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 1770 (quoting Hernandez, 500 U.S. at 360).

### a. Cantine and Melendez

The first round of Batson challenges centered on Cantine and Melendez. (Tr. 712-13.) The prosecutor, in response to the Court's request for race-neutral reasons, explained that his challenge of Cantine was due to his residence and professional activity in East New York, where the murders were committed. As to Melendez, he stated that as a young, unmarried female student he did not believe she had adequate life experience. (Tr. 713.) Perez now argues that the trial judge erred "by failing to state with specificity whether it credited the prosecution's race-neutral reasons . . . and whether it rejected the defense allegations of pretext." (Petition at 69.) The argument conflates the second and third steps of the Batson inquiry. Step two merely requires that the trial court seek race-neutral reasons for the defense's peremptory challenges.[4] It does not require that the trial court make express rulings as to those reasons. McKinney, 326 F.3d at 98, 100. Credibility determinations, put into issue by only the allegations of pretext attacking proffered race-neutral explanations, are left to the third step of Batson. Therefore, the trial court's failure to expressly credit the prosecutor's reasons in step two might bruise the formulaic structure of Batson, but not its substance. Such failure alone is not a ground for relief.

---

[4] The trial court in this case twice requested race-neutral reasons, asking the prosecutor:

> "Are there some racial reasons in your mind for bumping these two jurors, sir?" (Tr. 711.)

> "You heard it. Do you have any reasons?" (Tr. 712.)

The heart of the step two inquiry remains, certainly, but that merely required the trial court to determine whether the proffered reasons for challenge were "facially neutral." See Hernandez, 500 U.S. at 379. And here, nothing in the prosecutor's proffered reasons suggest that he elected to strike either Cantine or Melendez with the purpose to exclude African-American or Hispanic jurors. The reasons offered—lack of life experience and overfamiliarity with the area where the crime was committed—are acceptable race-neutral bases for peremptory challenges. See Jordan, 206 F.3d at 200 (life experience is facially neutral); Escobar v. Senkowski, 02-cv-8066, 2005 U.S. Dist. Lexis 44164 (S.D.N.Y. May 26, 2005) (familiarity with the neighborhood where a crime was committed is facially neutral). The prosecution carried its burden.

### b. Lawrence, Soto, and Generette

The second round of Batson challenges,[5] (Lawrence, Soto, and Generette), (Tr. 717-18), kicked into high gear with the following colloquy:

> THE COURT: Before we proceed, Miss Scolari, I had indicated to you that I thought the record reflected the reasons why they were challenged, but I'm not going to put the words in Mr. Reeves' mouth.
>
> Let me just say this: Mr. Lawrence may have reluctantly admitted that he was willing to sit, but his body language indicated a reluctance. You may not, in your mind, accept that as a reason, and in your mind you may feel that Mr. Lawrence because he's an African American, somewhat street, and has a sense of where this case is going with respect to your defendant, your client, but it's clear that any challenge for -- any challenge that Mr.

---

[5] Defense counsel's initial Batson objection was not specific as to any individual prospective jurors. Defense counsel Scolari generally objected that "[e]very single person that Mr. Reeves has knocked out is a person of color, African American or Hispanic descent." (Tr. 711.) After requesting to make a record, Ms. Scolari noted the peremptory challenges as to Lawrence, Soto, Generette, Melendez, and Cantine. (Tr. 711-12.) The trial court then dealt with the objection as to Cantine and Melendez. After a recess, Ms. Scolari again raised the Batson objections as to Lawrence, Soto, and Generette. When asked by the trial court if defense counsel wished to extend its Batson objection, defense counsel responded that "[i]nitially . . . [she] had indicated that all of the jurors that [the prosecutor had] challenged . . . were people of color, Hispanic or African American background." (Tr. 717.) The pinpoint objections she pressed are the ones ripe for review.

Reeves would have made in terms of cause would not have been granted. And clearly, the only other option he had, given his body language and demeanor, would have been peremptory challenge.

As to Mr. Soto, you know Mr. Soto initially indicated --

. . .

MS. SCOLARI:   I don't mean to interrupt the Court. It just [seems] that Mr. Reeves would have to respond rather than the Court why he excused people.

THE COURT:   Miss Scolari, I did indicate to you the record is clear with respect to the other people, and you said, No, the record was not clear, and I'm trying to enlighten you as to the Court's thinking on this.

…

THE COURT:   Mr. Soto is an Hispanic male who initially, when he was seated, said he recognized someone. Your co-counsel quickly pointed that out to me and I asked him and Mr. Soto said the defendant. We then sent the jurors out and spoke to Soto, and notwithstanding the fact that Mr. Soto said, look, the defendant looks familiar, and it may not affect me, I think it would be foolish for Mr. Reeves to go ahead and select because of the possible familiarity and association. Now, you may have accepted Mr. Soto's response, but Mr. Reeves certainly doesn't have to, and I don't think there is anything sinister in what he did in that regard.

…

MS. SCOLARI:   I understand that. I have a question, your Honor, if I may. It's my understanding that when a challenge is made, that the prosecutor must give reasons as to each juror.

…

THE COURT:   I am cutting to the chase. I haven't made a determination that you made a prima facie case. I am trying to get to the bottom without a prolonged discussion.

…

MR. REEVES:   [Regarding Generette] [t]wo things. One, she indicated in her family there was someone who was convicted out of state and was doing time for selling drugs. This case has got the element of drugs and she had indicated that a friend was killed and she used the language, he was

17

popped. To me that seemed to be inappropriate for this type of case, and that is the reason that I am challenging Miss Generette.

…

MS. SCOLARI: Your Honor, it's my understanding when a Batson challenge is made, the prosecutor has the burden of explaining each selection of his race-neutral reason for striking people.

…

MS. SCOLARI: I am having difficulty. Once a prima facie finding is made, which I think you did, then the prosecutor has to give the reasons as to each juror.

THE COURT: Mr. Reeves. . . . Go through each and every one.

…

MS. SCOLARI: You gave him reasons. That's my objection. You have now given Mr. Reeves the green light as to what he should say, if he did not figure that out.

THE COURT: I disagree with you.

…

MS. SCOLARI: But you are . . . giving [him] the reason.

THE COURT: It's obvious from the record.

MS. SCOLARI: It is not.

THE COURT: It's not obvious to you.

…

MR. REEVES: Mr. Lawrence, in repeated attempts to rehabilitate him, told Miss Scolari and this Court if it boiled down to sequestration, he would be focused on the child and not the case. That is a reason I struck Mr. Lawrence.

As to Mr. Soto, in addition to telling the Court that Mr. Perez looked familiar yesterday, when Mr. Soto was exiting the courtroom, despite repeated warnings by this Court not to have any contact with any of the parties, Mr. Soto said good-bye to Mr. Perez, told him to hang in there and gave him the peace sign.

18

(Tr. 718-26.)

Perez contends that in discussing the reasons it found "obvious from the record" and sufficient to strike Lawrence and Soto, "the [trial] court abandoned its neutrality and demonstrated that it was not properly effectuating the meaning of race-neutrality as that term is used in the Batson caselaw." (Pet. at 70.) What is true beyond dispute is that the trial court did not rigidly follow the Batson three-step process. It is equally clear, however, that the court got to where it would have inevitably gotten had it followed the Batson liturgy: to step three, the claim of pretextuality. The record also reflects that the trial judge expressed an opinion as to why he thought there were obvious race-neutral reasons supporting the peremptory challenges questioned by the defense. But, critically, he did not slam the door shut. Instead, upon the urging of defense counsel, the trial judge instructed the prosecutor to offer his own reasons. And the prosecutor did just that. In fact, the prosecution offered entirely independent race-neutral reasons, bolstering the showing the court thought clear from the record, satisfying the second prong of Batson. Although the trial court's approach was less than the ideal, it was patently not constitutionally deficient.[6] See Messiah v. Duncan, 435 F.3d 186, 199 (2d Cir. 2006) (affirming Batson challenge despite the failure of the trial court to make a complete adjudication of the race-neutral reasons because the Court "locate[d] a Batson adjudication later in the colloquy").

On the instant record, to reiterate, there were no substantive defects at step two. The reasons proffered by the prosecution have been recognized to be of a facially neutral class; none

---

[6] If, on the other hand, the court had merely proffered what it believed to be race-neutral reasons for the remaining peremptory challenges and foreclosed further inquiry, the outcome might be different. See Hughes v. Mitchell, 98 Civ. 2854, 1999 U.S. Dist. Lexis 19158 (S.D.N.Y. Dec. 2, 1999) (district court granting a writ of habeas corpus where it found the trial judge failed to elicit *any* race-neutral reasons from the prosecutor, proffered race-neutral reasons for the prosecutor's subjective determination, then closed the trial record on petitioner's Batson objection).

suggest, on their face, that the prosecutor acted with the intent to discriminate. Specifically, with respect to Generette, the possibility that a juror has family members who have narcotics-related criminal histories is a widely accepted reason for employing a peremptory strike. See Green v. Travis, 414 F.3d 288, 300-01 (2d Cir. 2005) (evidence of family members that have been either arrested or family experience with narcotics establishes the racial neutrality of a peremptory challenge); United States v. Lawal, No. 97-1026, 1997 U.S. App. LEXIS 29360, at *2 (2d Cir. Oct. 21, 1997) ("Both jurors were challenged on the basis of family criminal histories. . . . These bases are well-accepted, facially race-neutral reasons."). With respect to Soto, a juror's familiarity with the defendant has also been deemed facially neutral for purposes of Batson's step two. See Williamson v. Burge, 9:02-CV-0044, 2005 U.S. Dist. LEXIS 44557, at *57-58 (N.D.N.Y. June 28, 2005) (peremptory challenge based on the fact that the juror stated that the names of the co-defendants were familiar to her was a sufficiently race-neutral and nonpretextual reason). Finally, regarding Lawrence, justifying a peremptory strike on the ground that the juror had personal obligations that may distract him during trial has also been found to be facially neutral. See Barbara v. Goord, CV-98-4569, 2001 U.S. Dist. LEXIS 22534, at *13 (E.D.N.Y. Dec. 27, 2001) (prosecutor's reason for striking juror because "she was looking for a job, which might distract her during trial" was facially neutral). So armed, the People sustained their step two Batson burden as a matter of substance, offering no ground for relief on this petition.

    3. Pretextuality

    At step three, the trial court must determine whether the challenging party has met its burden of proving that the peremptory strike under attack was in fact the product of purposeful discrimination. Batson, 476 U.S. at 98. Although the burden is on the moving party throughout, at this third Batson step, the persuasiveness of the nonmoving party's facially neutral explanation

becomes relevant. See Galarza v. Keane, 252 F.3d 630 (2d Cir. 2001). The trial judge must make "'the ultimate determination on the issue of discriminatory intent based on all the facts and circumstances.'" Jordan, 206 F.3d at 200 (quoting United States v. Alvarado, 923 F.2d 253, 256 (2d Cir. 1991)). However, "[t]here will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." Hernandez, 500 U.S. at 365; see also McKinney, 326 F.3d at 98. The step three determination of discriminatory intent "represents a finding of fact of the sort accorded great deference on appeal . . . ." Hernandez 500 U.S. at 364 (citing Batson, 476 U.S. at 98 n.21). Such factual findings by "state courts are presumed to be correct, and may be set aside . . . only if they are 'not fairly supported by the record.'" Purkett, 514 U.S. at 769 (quoting 28 U.S.C. § 2254(d)(8)). Correspondingly, this presumption that the state court acted reasonably can only be rebutted by "clear and convincing evidence." Alston v. Phillips, 703 F. Supp. 2d 150, 175 (E.D.N.Y. 2010) (citing Miller-El v. Dretke, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325 (2005)).

　　*a.　Cantine and Melendez*

　　Perez contends woodenly that the trial court botched step three because it failed to explicitly reject the defense allegations of pretext. While "it is error to deny a Batson motion without determining whether the prosecution's race-neutral explanations for the challenged peremptory strikes are credible," United States v. Thomas, 320 F.3d 315, 320 (2d Cir. 2003), there are a variety of ways in which a trial court can make such an adjudication. No specific incantation is required. See McKinney, 326 F.3d at 100 ("Although reviewing courts [may] prefer[] [a] trial court to provide express reasons for each credibility determination, no clearly established federal law require[s] the trial court to do so."); Hernandez, 500 U.S. at 357 n.2 (recognizing that step three may be implied, noting that "[t]he trial judge appears to have

accepted the prosecutor's reasoning as to his motivation"). Here, the trial court's ruling on the credibility of the prosecutor's nondiscriminatory reasons is manifest and certainly satisfactory under Batson. After hearing the People's proffered reasons and permitting defense counsel to rebut those reasons at length, the trial judge made its rulings: as to "Miss Melendez, the Court is satisfied, Mr. Cantine, perhaps not." (Tr. 715) After further argument by the prosecution in support of its use of a peremptory to strike Cantine, the court definitively ruled, "Your Batson is granted to Cantine, to Melendez it is denied." (Tr. 715). With the defense winning one of its Batson challenges, there could be no clearer demonstration that the trial court fully understood its obligation, carefully considered its decision, and properly discharged its Batson step three duty.

> b. *Lawrence, Soto and Generette*

Following the same track, petitioner fares no better on the second round challenges. Perez presses on again that, absent an articulated credibility analysis, "there can be no method by which this Court may resolve to a degree of legally sufficient satisfaction the issue of whether the pernicious taint of racism corrupted the jury selection process in this case." (Pet. at 73.) The argument misses the point. No one quarrels with the Batson objective to free jury selection from the bonds of racial bias. But, as noted above, a "talismanic recitation of specific words" is not required "in order to satisfy Batson's [core] requirement that the trial court must rule on the credibility of the race-neutral reasons for the peremptory challenge" subject to review. Isaac v. Brown, 205 F. App'x 873, 876 (2d Cir. 2006) (quoting Galarza, 252 F.3d at 640 n.10) (internal quotation marks omitted). Rather, "a general crediting of the prosecutor's race-neutral explanations" is sufficient at step three. Galarza, 252 F.3d at 640 n.10; see also United States v. Perez, 35 F.3d 632, 634 (1st Cir. 1994) (trial court satisfied the step three requirement merely by

22

stating "I understand" in response to the prosecution's proffered reason). Regarding Lawrence, Soto and Generette, the trial judge made an unequivocal determination on the record. After extensive argument, the judge expressed on a number of occasions that he accepted the proffered race-neutral reasons grounding the prosecutor's strikes of these three prospective jurors.

Furthermore, on this record, petitioner cannot come close to proving that the prosecution's proffered reasons for its peremptory challenges were pretextual and discriminatory. It is well-settled that the best evidence for credibility determinations lies with "the judge's observations of the attorneys and prospective jurors." Galarza, 252 F.3d at 635. There is more than enough before the Court supporting the trial judge's finding that the prosecutor's facially neutral reasons were credible. Generette discussed a relative who was arrested for a drug-related crime and was serving a jail sentence at the time, as well as a relative who had been killed in connection with a drug dispute. (Tr. 600, 684). Soto disclosed that the defendant looked familiar. (Tr. 632). And Lawrence vehemently warned that if chosen, he would be more concerned about his child than the case. (Tr. 674). Since the "evaluation of [counsel's] state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province,'" Hernandez, 500 U.S. at 365 (quoting Wainwright v. Witt , 469 U.S. 412, 428, 105 S. Ct. 844, 854 (1985)), the Court finds that the trial court's decision overruling the defense objection to the strikes of Lawrence, Soto and Generette did not violate Batson. Certainly, Perez has not presented clear and convincing evidence to the contrary.

More dispositively, the Court is, of course, mindful of the Appellate Division's explicit finding that "the [trial] court did not improperly rush or compress the Batson inquiry and, therefore, [Perez] failed to meet his burden of establishing an equal protection violation." Perez, 14 A.D.3d at 625. Under AEDPA, the instant habeas petition can only be granted if the Second

Department's finding that Perez had failed to sustain his <u>Batson</u> objection is an unreasonable application of federal law. <u>Cox v. Donnelly</u>, 387 F.3d 193, 200 (2d Cir. 2004). Sitting in federal habeas review, the Second Department's decision must be evaluated here by the Court to see whether that decision "'reflect[s] some additional increment of incorrectness such that it may be said to be unreasonable.'" <u>Id.</u> (quoting <u>Aparicio v. Artuz</u>, 269 F.3d 78, 94 (2d Cir. 2001)). The Supreme Court recently emphasized that AEDPA "preserves authority to issue the writ [of habeas corpus] in cases where there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." <u>Harrington</u>, 562 U.S. at ___, 131 S. Ct. at 786. Not only is there ample support for the state court's <u>Batson</u> determination in such deferential light, the Court would reach the same conclusion on <u>de novo</u> review.

## C. **Rosario Violation**

Petitioner's assignments of error in the trial process are not confined to jury selection. Perez also argues that the trial court's failure to order disclosure of certain reports relating to Detective Kennedy's interviews with petitioner's girlfriend and mother violates the <u>Rosario</u> rule. The <u>Rosario</u> rule, codified at CPL § 240.45, requires that the prosecution disclose any statement of a witness whom it intends to call at the hearing or trial, which is in the People's possession or control and relates to the subject matter of the witness's testimony. <u>Curry v. Bennett</u>, No. 02-CV-3655, 2003 U.S. Dist. LEXIS 23916, at *35 (E.D.N.Y. Oct. 17, 2003). The Appellate Division found no such violation, noting that Detective Kennedy did not testify on direct examination about those interviews. <u>Perez</u>, 14 A.D.3d at 626. Regardless whether correctly decided or not, this claim rests exclusively on state criminal procedure law grounds and is not

cognizable on habeas review. See 28 U.S.C. § 2254(d); McGuire, 502 U.S. at 67-68, 112 S. Ct. at 479-80. It is dismissed.

## D. **Sentencing Procedures**

Petitioner next seeks reversal of his first degree murder conviction, or in the alternative, vacatur of his sentence of life imprisonment without parole, on the ground that the sentencing procedures in CPL § 400.27 are unconstitutional. The Appellate Division found that the claim was "unpreserved for appellate review or without merit." Perez, 14 A.D.3d at 626. Under Jimenez v. Walker, "[s]uch an 'either/or' decision is deemed to rest on the merits . . . because there is no plain statement to the contrary." 458 F.3d 130, 146 (2d Cir. 2006) (citing Fama, 235 F.3d at 810-11). Jimenez went on to observe that "when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved or [as opposed to "and"] without merit,' the validity of the claim is preserved and is subject to federal review. [Stated differently, w]hen [a court] uses such language, the state court has not adequately indicated [on the face of its opinion] that its judgment rests on a state procedural bar." Id. at 139. Following the Appellate Division's use of such ambiguous language, Perez raised this claim in his unsuccessful application for leave to appeal to the New York Court of Appeals. As a result, the Court will construe this claim as exhausted (preserved and adversely determined on the merits) at all necessary state levels and will, ceteris paribus, apply the appropriate AEDPA standard of review in analyzing it.

The provision of New York's criminal procedure law targeted by Perez provides in pertinent part:

> Upon the conviction of a defendant for the offense of murder in the first degree [], the court shall promptly conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or to life imprisonment without parole . . .

> Nothing in this section shall be deemed to preclude the people at any time from determining that the death penalty shall not be sought in a particular case, in which case the separate sentencing proceeding shall not be conducted and the court may sentence such defendant to life imprisonment without parole or to a sentence of imprisonment for the class A-I felony of murder in the first degree other than a sentence of life imprisonment without parole.
>
> ...
>
> The separate sentencing proceeding provided for by this section shall be conducted before the court sitting with the jury that found the defendant guilty.

CPL § 400.27. Perez argues that this sentencing scheme violates the constitutional guarantees of due process and equal protection because it provides the court "unfettered discretion" to impose a sentence of life imprisonment without the additional process afforded capital defendants.[7] This argument raises two distinct, but related issues: (1) the allegedly arbitrary procedural distinction between sentencing capital and noncapital defendants, and (2) the court's "unfettered discretion" to impose a sentence of life imprisonment. In People v. Hansen, 99 N.Y.2d 339, the New York Court of Appeals addressed the first issue, holding that different sentencing procedures for capital and noncapital defendants do not violate due process. In reaching that decision, New York's high court relied on well-established principles of federal law holding that the "'qualitative difference between death and all other penalties'" compels a "heightened . . . process . . . with regard to the sentencing procedures in death cases." Hansen, 99 N.Y.2d at 345 (quoting Harmelin v. Michigan, 501 U.S. 957, 995, 111 S. Ct. 2680, 2702 (1991)). As such, the fact that Perez was not entitled to a separate sentencing proceeding before a jury in his noncapital case, does not violate the constitutional guarantee of due process and equal protection. Hansen is, without doubt, in full harmony with Harmelin, the applicable Supreme Court precedent. On AEDPA review, applying these precedents, Perez's claim fails.

---

[7] The analysis of petitioner's due process claim embraces his equal protection claim. People v. Hansen, 99 N.Y.2d 339, 344 n.3, 786 N.E.2d 21, 23, 756 N.Y.S.2d 122, 124 (2003).

The Hansen court did not directly address the "unfettered discretion" argument, as the issue was not preserved. Hansen, 99 N.Y.2d at 344 n.2. The absence of formal decision is academic, however, for the argument is without merit, particularly on habeas review. The sentencing scheme in New York hardly gives a judge "unfettered discretion." In sentencing a person convicted of a felony, the court must first order a presentence report, which contains information regarding the commission of the offense, the defendant's background, and any other relevant matters. CPL § 390.20(1). The parties are then permitted to submit a written memorandum containing mitigating factors or other information relevant to sentencing. CPL § 390.40(1). Additionally, before imposing the final sentence, the sentencing court must afford the prosecutor, defense counsel, and defendant an opportunity to make a statement bearing on the sentence. CPL § 380.50(1). And either before or after receiving these statements, the court may summarize the factors it considers relevant to the imposition of the sentence. CPL § 380.50(3). If the court chooses to summarize these factors, it must afford an opportunity to the defendant or defense counsel to comment on the summarization. Id. Finally, after the sentence is imposed, the defendant may seek review in an appellate court, which may reverse or modify a sentence that is "illegal or unduly harsh or severe." CPL § 470.15(1)(c). In sum, while a trial court does indeed exercise "wide latitude" throughout the sentencing process, People v. Naranjo, 89 N.Y.2d 1047, 1049, 681 N.E.2d 1272, 1273, 659 N.Y.S.2d 826, 827 (1997), it is evident that these pre-sentencing and post-sentencing procedures place sufficient guidelines and limits on the sentencing court. The latitude afforded trial courts is neither "unlimited" nor "unfettered," so as to amount to a denial of due process. Through the presentence report and the various opportunities for all parties to respond to facts underlying a sentence, this statutory scheme focuses the court's discretion on reliable and relevant matters, Hansen, 99 N.Y.2d at 346, and

further provides a record upon which a defendant may argue on appeal that that discretion has been abused. In fact, New York's sentencing procedural safeguards, if anything, afford a criminal defendant even greater protection than that afforded by federal sentencing procedures. For these reasons, the summary rejection by the Appellate Division of this aspect of petitioner's attack on the constitutionality of CPL § 400.27, and the manner in which it controlled the imposition of the sentence from which he seeks habeas relief, offends no precedent of the United States Supreme Court. Perez, consequently, states no ground upon which a writ of habeas corpus may issue.

## E. Wade Violation

In another claim, petitioner seeks to upset the identifications made by two eyewitnesses, Diane Bennett and Sidney Bourcicault, who were in a relationship at the time. Perez contends their identifications of him were procured as a result of unduly suggestive identification procedures. Additionally, Perez argues that the trial court abused its discretion by not compelling Bennett and Bourcicault to testify at the suppression hearing. On appeal, the Appellate Division found this claim "unpreserved for appellate review or without merit." Perez, 14 A.D.3d at 626. As with his challenge to the sentencing procedure, these arguments are deemed exhausted and summarily rejected.

On December 17, 1997, Kennedy and other detectives visited Bennett at her residence, at which time she selected Perez from a photo array. Later that evening, Kennedy presented the same photo array to Bourcicault at his residence, with the same result. Perez argues that Bennett may have contacted Bourcicault during the time that lapsed between their viewings and somehow divined a way to direct him to her pick, making the identification procedure unduly suggestive. Furthermore, he contends that since the trial court only heard testimony from

Kennedy at the suppression hearing, the court could not rule out the possibility that Bennett and Bourcicault had communicated. The trial court rejected this argument and admitted the identifications, concluding that the "possibility of one witness independently contacting another witness prior to his viewing the same array go more to weight than admissibility" and is thus an appropriate subject for cross examination at trial. In rejecting the application to compel testimony of the identifying witnesses, the court found that Perez's limited right to examine such witnesses was not triggered, as the record upon which the court made its finding was not "notably incomplete" and Perez's argument was entirely speculative—that there was absolutely no evidence that the two witnesses had in fact communicated.

The law applicable to this contention is well-defined. Pretrial identifications that are unduly suggestive violate the due process rights of a defendant and, therefore, are not admissible at trial to determine the guilt or innocence of an accused. People v. Chipp, 75 N.Y.2d 327, 335, 552 N.E.2d 608, 612, 553 N.Y.S.2d 72, 76 (1990) (citing United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926 (1967)). The Supreme Court has held that "[i]t is the likelihood of misidentification which violates a defendant's right to due process," making an identification procedure that leads to a very substantial likelihood of misidentification the "primary evil to be avoided." Neil v. Biggers, 409 U.S. 188, 198, 93 S. Ct. 375, 382 (1972). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." Id.

New York's criminal procedure regime for conducting pretrial proceedings to suppress identification testimony is fully compliant with Wade and all controlling Supreme Court precedents. See Wade, 388 U.S. 218, 87 S. Ct. 1926; People v. Rodriguez, 79 N.Y.2d 445, 583

N.Y.S.2d 814 (1992). At a pretrial suppression proceeding, the defendant bears the ultimate burden of proving that an identification procedure is unduly suggestive. But to meet this burden, a defendant does not have an absolute unqualified right to call a complaining or identifying witness. People v. Scott, 290 A.D.2d 522, 522, 736 N.Y.S.2d 691, 692 (2d Dep't 2002) (citing Chipp, 75 N.Y.2d 327). "Mere speculation" that a witness's testimony may reveal something improper about a pretrial identification procedure does not compel a court to take testimony of that witness. See Gant v. Walsh, 07-CV-2427, 2008 U.S. Dist. LEXIS 50916 (E.D.N.Y. July 3, 2008); Rivalta v. Artuz, 96 Civ. 8043, 1997 U.S. Dist. LEXIS 10282 (S.D.N.Y. July 16, 1997). Still, where testimony about the identification procedure employed is "notably incomplete," a defendant has "a right to explore the circumstances under which his pretrial identification was made by various witnesses." People v. Sokolyansky, 147 A.D.2d 722, 723, 538 N.Y.S.2d 69, 70 (2d Dep't 1989); see also People v Ingram, 120 A.D.2d 814, 501 N.Y.S.2d 931 (3rd Dep't 1986). Pointedly, a defendant may call an identifying witness when testimony of a police officer who conducted a pretrial identification leaves "open the possibility that a witness who had already viewed the array influenced or suggested a subsequent witness's identification of the defendant." People v. Ocasio, 134 A.D.2d 293, 294, 520 N.Y.S.2d 620, 620 (2d Dep't 1987). See also Sokolyansky, 147 A.D.2d at 723 (testimony of one police officer conducting a pretrial identification does not necessarily rule out suggestive conduct when the identifying witnesses are left in the presence of other police officers for twenty minutes prior to their identifications).

Apparently, Perez now seeks to advance the far-fetched argument that, given Bennett and Bourcicault were in a relationship, Kennedy's testimony at the suppression hearing was somehow "notably incomplete." While Kennedy could testify about his administering of the photo array, so the argument goes, he could not testify as to the conduct of the witnesses *between*

their respective identifications. If they had in fact communicated about the photo array, as Perez conjectures, this would perhaps increase the likelihood of misidentification, making the procedures constitutionally suspect. Although the identifications took place at different times and in different locations, it is perhaps true that the possibility of interactive conduct was heightened by the fact Bennett and Bourcicault were in a relationship at the time. Thus, Perez contends, he was not simply speculating about a host of implausible circumstances that may have influenced the photo identifications. Cf. Rivalta, 1997 U.S. Dist. LEXIS 10282, at *7-8. Effectively, petitioner's point is that his speculation is more finely tuned.

Yet, putting aside the fact that, finely tuned or not, the argument rests on sheer speculation, and, even assuming arguendo that Bennett and Bourcicault's identification of Perez at their separate photo array viewings were unnecessarily and impermissibly suggestive, the next step is not suppression of the identifications; it is to determine whether, "under the 'totality of the circumstances[,]' the identification was reliable even though the confrontation procedure was suggestive." Biggers, 409 U.S. at 199, 93 S. Ct. at 382; see also Abdur Raheem v. Kelly, 257 F.3d 122, 133 (2d. Cir. 2001) ("In sum, the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." (citations omitted)). As the Supreme Court has established, the factors to be considered in determining reliability "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382. No one factor, in and of itself, is dispositive. Raheem, 257 F.3d at 135 (citing Biggers, 409 U.S. at 199, 93 S. Ct. at 411).

It is a dry hole. The People did not introduce the photo identifications at trial; Bennett and Bourcicault had subsequently identified Perez at pretrial lineups on December 31, 1997, which was 19 days after the shootings. Even without giving deference to the Appellate Division's summary finding that Perez's argument had no merit, his petition grounded in a <u>Wade</u> violation cannot be sustained. Because, even crediting the mystifying notion that the two witnesses, romantically involved, but without any connection to Perez, had communicated between their respective photo identifications in some way that compromised the second witness's photo identification, the Court finds <u>de novo</u> that both photo identifications and the subsequent line-up and trial identifications made by both witnesses were independently reliable and not impermissibly suggestive. There is ample evidence in the record to support a finding that the photo arrays did not taint the pretrial lineups and trial identifications. Both witnesses had a reasonably good opportunity to view Perez as he passed them on the sidewalk immediately before the shootings and as he left the crime scene brandishing a firearm, taking special notice of his distinctive gait. And while there were some discrepancies in their initial descriptions, both Bennett and Bourcicault expressed certainty as to their subsequent identifications. <u>See</u> <u>Roberts v. Lefevre</u>, No. 88-CV-4114, 1990 U.S. Dist. LEXIS 550, at *13-14 (S.D.N.Y. Jan. 2, 1990). Considering these factors, the identifications were sufficiently reliable to be placed before the jury. "Short of the point at which the court must conclude, after considering [the evidence], that under all the circumstances of the case, there is a very substantial likelihood of irreparable misidentification, the presence of some element of untrustworthiness goes only to the identification's weight, not to its admissibility." <u>Dunnigan v. Keane</u>, 137 F.3d 117, 128 (2d Cir. 1998) (quoting <u>Manson v. Brathwaite</u>, 432 U.S. 98, 116, 97 S. Ct. 2243, 2254 (1977)) (internal quotation marks omitted).

Consequently, applying the totality of the circumstances test, the Court finds no error at all in the state courts' adverse determination of petitioner's contention that he was the victim of an impermissibly suggestive identification process. Cf. Jimenez, 458 F.3d at 147. More importantly, if there be error in either the substance of or the adjudicatory process resulting in those determinations, it certainly does not rise to the level required under AEDPA, that is, the determinations are "an 'unreasonable,' not simply incorrect or erroneous, application of federal law." Cox, 387 F.3d at 200 (citing Williams, 529 U.S. at 412, 120 S. Ct. at 1523), or, stated differently, that they "reflect some additional increment of incorrectness such that [they] may be said to be unreasonable." Id. (citing Aparicio, 269 F.3d at 94).

## F. **Brady Violation**

The petition also avers Brady violations, including the prosecution's failure to disclose a report that was prepared by Detective Kennedy and related exculpatory statements by defense witness Lorenzo. The report, which was first disclosed at the hearing granted upon petitioner's motion to set aside the verdict, reveals that, during the investigation, Lorenzo had informed Kennedy that the shooter was someone who had a similar physical appearance to petitioner and was named "Lucky." Kennedy did not testify about the report or the underlying conversation on direct examination, and Lorenzo did not testify at all at trial.[8] The trial court concluded that the report was not Brady material because the exculpatory nature of the witness was already known to the defense. But Perez argues that the failure to disclose the report denied him the opportunity to bolster his theory of the case as one of mistaken identification, and demonstrated failure on the part of law enforcement to pursue other significant leads. The Appellate Division found that this

---

[8] Petitioner argues that Lorenzo's failure to testify was the result of prosecutorial misconduct. See Part III.G, infra.

claim was "unpreserved for appellate review or without merit." Perez, 14 A.D.3d at 626, and, as noted above, is treated as a summary denial on the merits of the claim.

The prosecution, of course, is required to provide the defense with exculpatory evidence pursuant to Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and its progeny. Brady requires that the prosecution "turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." Pa. v. Ritchie, 480 U.S. 39, 57, 107 S. Ct. 989, 1001 (1987) (citing Brady, 373 U.S. at 87; 83 S. Ct. at 1196). There are three factors to be examined in any Brady analysis: "(1) the [prosecution], either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001) (citation omitted). Prejudice is measured by whether the "nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Strickler v. Greene, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948 (1999).

Even assuming that the People willfully withheld the report and that the report was favorable to Perez, the factual record in this case reveals absolutely no prejudice. The withheld report merely memorialized Kennedy's interview with Lorenzo on April 10, 1998. In a letter dated April 13, 1998, the District Attorney's Office notified defense counsel that Lorenzo claimed to be in possession of exculpatory evidence and provided Lorenzo's contact information. Furthermore, the trial record shows that, prior to Kennedy's testimony on May 12, 1999, the prosecutor read an excerpt from a letter by defense counsel that Lorenzo "ha[d] told both defense and the prosecution that he saw the lone shooter and it was not Dimas Perez." After reading the letter, defense counsel argued that the prosecutor should turn over Lorenzo's statements to Kennedy because it was material the defense did not possess. Moving forward in the timeline, at

a post-verdict hearing, defense counsel admitted that her first meeting with Lorenzo took place in February 1998, when Lorenzo first relayed the identical exculpatory statement he would much later give to Detective Kennedy. Scolari then had several other discussions with Lorenzo prior to and after his interview with Kennedy. In fact, during one of these interviews, Lorenzo informed Scolari that he had gone to the police and informed them that someone other than Perez had shot the victims.

Highlighting these facts, but based on the entire record, petitioner's Brady claim fails. Brady is not meant "to supply a defendant with all the evidence in the [prosecution's] possession which might conceivably assist the preparation of his defense." Tate v. Wood, 963 F.2d 20, 25 (2d Cir. 1992) (citing United States v. Leroy, 687 F.2d 610, 619 (2d Cir. 1982)). Rather, it assures "that the defendant will not be denied access to exculpatory evidence only known to the [prosecution]." Id. A prosecutor, as a consequence, need not package a witness's statement for delivery to a defendant who is "on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." United States v. Stewart, 513 F.2d 957, 960 (2d Cir. 1975). Perez argues that the defense "was ignorant of what [Lorenzo] told the police" on April 10, 1998. Notwithstanding, the record is abundantly clear that the defense knew the essential facts of Lorenzo's statements to Kennedy on that date. In fact, the defense knew the very same facts before Kennedy did -- it learned then from Lorenzo directly, and even knew that Lorenzo had communicated those very facts to the police. Petitioner's argument seems to be that the defense was ignorant of *exactly* or *precisely* what Lorenzo told the police. But Brady provides no such right. See Stewart, 513 F.2d at 960 (citing United States v. Bagley, 473 U.S. 667, 675 (1985)) (stating that Brady does not impose an obligation on the prosecution to "deliver [the] entire file to defense counsel"). Fully apprised of

the putative "Lucky did it" exculpation, Perez was not prejudiced in the slightest in his defense and, accordingly, there was no <u>Brady</u> violation.

### G. <u>Prosecutorial Misconduct</u>

Petitioner's final refuge is nestled in his contentions that Lorenzo's decision not to testify was the result of prosecutorial misconduct. According to Perez, Lorenzo's testimony was the "jewel in the crown of the defense" as he would testify that he witnessed the shooting and that it was not perpetrated by Perez. During the trial, of course, Lorenzo was arrested for narcotics offenses, and on the day he was scheduled to testify, David Chidekel, Lorenzo's attorney, relayed to the court that his client was invoking the Fifth Amendment. After learning post-verdict that Chidekel had spoken to the prosecutor shortly before Lorenzo was scheduled to testify, Perez filed a § 440.10 motion to vacate the judgment. He claimed that prosecutor Reeves threatened Lorenzo, through his attorney, with a stiffer penalty on the narcotics charges, should he testify at the Perez trial.

Federal habeas relief is limited to prosecutorial misconduct that "so infected the trial with unfairness" as to deny due process. <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986) (quotation omitted). To find such misconduct, courts examine "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper [conduct]." <u>Floyd v. Meachum</u>, 907 F.2d 347, 355 (2d Cir. 1990) (quotation omitted) (quoting <u>United States v. Modica</u>, 663 F.2d 1173, 1181 (2d Cir. 1981)).

Certainly, had the prosecutor hatched a plot to ensure that *the* key defense witness was "unavailable," it is inconceivable that conviction would survive collateral attack. But based on the record evidence, the Court simply cannot disturb the hearing court's adverse determination that the prosecutor had done no such thing.

At the post-verdict proceeding on petitioner's motion to vacate, the trial court heard from, among others, Chidekel, who testified for Perez, and Reeves. Lorenzo, who had been deported following conviction on the narcotics charges, remained "unavailable" to testify. After consideration of the evidence, the hearing court found no misconduct on the part of the prosecutor, noting that Reeves "merely responded" to Chidekel's questions about Lorenzo testifying at the Perez trial. The court also noted that much of Chidekel's testimony was "incredible and unworthy of belief," especially testimony about his conversation with Lorenzo after Reeves had allegedly promised a favorable sentencing recommendation. In any event, as the factual finding on the very issue under federal habeas scrutiny, it is deemed presumptively correct under AEDPA. At this juncture, Perez is obligated to provide "clear and convincing" evidence to the contrary. See Smith, 275 F. Supp. 2d at 365-66 (factual issues are presumed correct and a habeas petitioner must rebut this presumption by clear and convincing evidence); see also Parsad, 337 F.3d at 181 (noting that the presumption of correctness is critical when reviewing a "trial court's assessment of witness credibility"). Instead, Perez simply invites the Court to second-guess the hearing court's credibility assessment and determine on the same record that it was Chidekel, rather than Reeves, who was believable. This the Court sitting in habeas cannot do. And, certainly, on the facts actually found by the hearing court, the trial court's determination that there was no misconduct on this score was hardly error.

Perez also argues in his petition that the hearing court denied him equal protection in implying that Lorenzo's testimony was a necessary predicate to meeting his burden of proof, since he allegedly lacked the funds to produce Lorenzo for the hearing. The argument is apparently based on the hearing court's factual finding that, without Lorenzo's production, it could not determine whether he actually had exculpatory evidence and whether such testimony

would alter the verdict. But in its decision, the court also noted that Perez had not submitted any information regarding Lorenzo's whereabouts or had made any efforts to locate him. This point aside, Perez's equal protection argument is nothing but a smokescreen. While it is obvious that the hearing court would have relished Lorenzo's testimony to consider, it is equally obvious that the failure to produce Lorenzo at the hearing did not result from petitioner's in forma pauperis status. The salient point is that it was beyond the power of the state court to compel the production of a witness not located in the state, much less, given Lorenzo's deportation as a result of his felony drug conviction, a witness who had been deported. The cost of locating Lorenzo and Perez's alleged "lack of funds" is therefore irrelevant to this inquiry. In short, his equal protection argument is specious.

## IV.   **CONCLUSION**

For the foregoing reasons, the petition for habeas corpus filed by Dimas Perez is dismissed and the writ is denied. Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(2). In this light, the Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this Memorandum and Order would not be taken in good faith and therefore in forma pauperis is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 920-21 (1962).

The Clerk of the Court is directed to enter judgment and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
     June 6, 2011

s/ENV

_____

ERIC N. VITALIANO
United States District Judge